## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASYIA ANDREWS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BEECH-NUT NUTRITION COMPANY; GERBER PRODUCTS COMPANY (d/b/a Nestle Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America); HAIN CELESTIAL GROUP, INC. (d/b/a Earth's Best Organic Baby Food), NURTURE, INC.; and SPROUT FOODS, INC. (d/b/a Sprout Organic Foods),<br><br>Defendants. | CLASS ACTION COMPLAINT<br><br>CIVIL ACTION NO.:<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Asyia Andrews, on behalf of herself and all others similarly situated, by and through her undersigned attorneys, alleges against Beech-Nut Nutrition Company ("Beech-Nut"), Gerber Products Company (d/b/a Nestle Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America) ("Gerber"), Hain Celestial Group, Inc. (d/b/a Earth's Best Organic Baby Food) ("Hain"), Nurture, Inc. (d/b/a Happy Family Brands) ("Nurture"), and Sprout Foods, Inc. (d/b/a Sprout Organic Foods) (hereinafter collectively referred to as "Defendants"), the following facts based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## NATURE OF THE ACTION

*Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell unsafe products. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food…baby food manufacturers and federal regulators have broken the faith.*[1]

1.      The health and safety of infants and children are of the utmost importance.  Yet, Defendants, the baby food manufacturers, who vowed to protect and keep them safe, recklessly disregarded the safety, health, and wellbeing of millions of babies, toddlers, and children by knowingly selling baby food products containing dangerous amounts of toxic heavy metals: inorganic arsenic, lead, cadmium, and mercury (hereinafter collectively referred to as "Toxic Heavy Metals").  Toxic Heavy Metals are particularly hazardous to infants and children because they are developmental neurotoxins, meaning that exposure can significantly harm a baby's developing brain and nervous system, both in utero and after birth.  The effects often cause permanent loss of intellectual capacity, behavioral issues, such as Attention-Deficit/Hyperactivity Disorder ("ADHD"), and intelligence quotient ("IQ") loss.

2.       Plaintiff put her trust in Defendants.  She relied on repeated assurances that Defendants' baby food products were of the highest quality.  Most importantly, she believed Defendants' representations that their baby food products were safe.  Yet, Defendants knowingly concealed all material information about Toxic Heavy Metals, internal and external testing results, and the Defendants' products' hazards.  Defendants sacrificed the health and safety of infants, children, parents, and caregivers, to increase corporate revenue.  Defendants lied to Plaintiff and

---

[1] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "**Congressional Report**") (February 4, 2021) (online at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf) (last visited on March 20, 2021), attached hereto as **Exhibit A**.

millions of consumers and broke their trust and faith, by actively marketing and selling baby food products as safe while Defendants knew that its products were unsafe and contained dangerous amounts of Toxic Heavy Metals but decided to sell the products to parents anyway.

3.      Plaintiff brings this class action on behalf of herself, a proposed nationwide class, and a proposed New Jersey subclass.  The nationwide class is defined as follows: All persons who purchased one or more of Defendants' products containing Toxic Heavy Metals, in the United States for personal/household use (hereinafter the "Nationwide Class").  The New Jersey subclass is defined as follows: All persons residing in New Jersey who purchased one of more of Defendants' products containing Toxic Heavy Metals for personal/household use (hereinafter the "Subclass").[2]  Plaintiff and members of the Class seek injunctive and monetary relief based on Defendants' false advertising scheme and deceptive business practices in violation of state consumer protection laws.

4.      In April 2019, Healthy Babies Bright Futures, an alliance of nonprofit organizations, that actively work together to reduce babies' exposures to toxic chemicals ("Healthy Babies Bright Futures"), issued a report detailing the evaluation of 168 containers of various baby food products that lead to the disturbing revelation that 95% of the 168 products tested contained one or more Toxic Heavy Metals. [3]  Healthy Babies Bright Futures found that the samples had heavy metals, including arsenic, lead, mercury, and cadmium. Healthy Babies Bright Future's report stunned lawmakers and individuals throughout the county.

5.      Shortly thereafter, on November 6, 2019, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform

---

[2] The Nationwide Class and Subclass are collectively referred to herein as "Class" unless otherwise noted.
[3] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (December 2017) (online at https://www.healthybabycereals.org/sites/healthybabycereals.org/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on March 19, 2021).

("Congressional Subcommittee") opened an investigation, and requested internal documents and test results from seven of the largest baby food manufacturers in the United States: (1) Beech-Nut, (2) Hain, which sells products under the name "Earth's Best Organic" (hereinafter "Earth's Best Organic" or "Hain"), (3) Gerber, (4) Walmart, Inc., which sells products through its private brand Parent's Choice (hereinafter "Walmart"), (5) Sprout Foods, Inc., which sells food under the name Sprout Organic Food (hereinafter "Sprout"), (6) Campbell Soup Co., which sells baby food under the name Plum Organics (hereinafter "Campbell"), and (7) Nurture, Inc., which sells baby food under the names "HappyFamily Organics," "HappyBABY," and HappyTOT (hereinafter "Nurture" or "HappyBABY").[4]

6.     In response to the Congressional Subcommittee's request, Beech-Nut, Gerber, Hain, and Nurture, produced internal testing policies, test results for ingredients and finished products, and documentation about the companies' testing and quality assurance programs, ingredients, and/or finished products that exceeded their internal testing limits.  Three companies — Sprout, Campbell, and Walmart — refused to cooperate, to which the Congressional Subcommittee expressed "great concern[n] that their lack of cooperation might be obscuring the presence of even higher levels of Toxic Heavy Metals in their baby food products than their competitors' products."[5]

7.     Subsequently, on February 4, 2021, the Congressional Subcommittee published a detailed report, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter referred to as "Congressional Report") exposing that manufacturers, Beech-Nut, Gerber, Hain, and Nurture, recklessly disregard for the health and safety of babies by

---

[4] *See* **Exhibit A** at p.  2.
[5] *Id.*

knowingly selling baby food products with dangerously elevated levels of Toxic Heavy Metals. The Congressional Report also determined:

    a.   Industry self-regulation fails to protect consumers as Defendants' set their own dangerously high internal standards for Toxic Heavy Metals,

    b.   Defendants routinely ignored internal standards and continued to sell products with even higher Toxic Heavy Metals levels,

    c.   Defendants' prevalent practice of only testing ingredients that are included in their products instead of the finished product concealed even higher levels of Toxic Heavy Metals in finished baby food products, and

    d.   Despite Sprout's refusal to cooperate, independent data confirmed that Sprout baby food is similarly tainted with the same Toxic Heavy Metals.[6]

8.    The products at issue include the following (hereinafter all Defendant products will be collectively referred to as "Baby Food Products."):

    a.   **<u>Beech-Nut Products</u>**: The Beech-Nut products at issue include any Beech-Nut product that contained the following ingredients: Cinnamon, Organic Cumin, Organic Coriander, Oregano, Alpha Amylase, Organic Lemon, Turmeric, Sunflower Lecithin, Sweet Potato, Quinoa Flower, Prune Puree, Dehydrated Potato, Mango, Sebamyl 100, Apricot, Enzyme, Organic Quinoa Seeds, Blueberry, Carrots, Organic Pears; and the following products: Beech-Nut Rice Single Grain Baby Cereal; Beech-Nut Oatmeal Whole Grain Baby Cereal; Beech-Nut Classic Sweet Carrots; Beech-Nut Organics Carrots; Beech-Nut Naturals Sweet Potatoes; Beech-Nut Classics Sweet Potatoes; Beech-Nut Classics Sweet Peas; Beech-Nut Naturals Butternut Squash; Beech-Nut Organics Pumpkin; Beech-Nut Organics Apples; Beech-Nut Naturals Bananas; Beech-Nut Naturals Beets, Pear & Pomegranate; Beech-Nut Classics Mixed Vegetables; Beech-Nut Breakfast On-the-Go Yogurt, Banana & Mixed Berry Blend; Beech Nut Organics Sweet Potatoes; Beech-Nut Organics Pears; Beech-Nut Organics Apple Kiwi & Spinach; Beech-Nut Naturals Carrots; Beech-Nut Organics Pear Kale & Cucumber; Beech-Nut Oatmeal Whole Grain Baby Cereal; Beech-Nut Rice Single Grain Baby Cereal; Beech-Nut Banana Stage; Beech-Nut Sweet Peas Stage 2; Beech-Nut Carrots Stage 2; Beech-Nut Green Beans Stage 2; Beech-Nut Sweet Potatoes Stage 2; Beech-Nut

---

[6]*Id.* at p. 46.

Apple Stage 2 (hereinafter collectively referred to as "Beech-Nut Baby Food Products").

b.     **Gerber Baby Food Products**: The Gerber products at issue include: Gerber Toddler Mashed Potatoes & Gravy with Roasted Chicken Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Toddler Spiral Pasta in Turkey, Meat Sauce Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Sitter 2nd Foods Turkey Rice Dinner Plastic Tub, Gerber Sitter 2nd Foods Vegetable Beef Dinner Plastic Tub, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Sitter 2nd Foods Apple Chicken Dinner Plastic Tub, Gerber Sitter 2nd Foods Vegetable Beef Dinner Plastic Tub, Gerber Toddler Mashed Potatoes & Gravy with Roasted Chicken Meal, Gerber Toddler Pick-ups Chicken & Carrot Ravioli Meal, Gerber Toddler Spaghetti Rings in Meat Sauce Meal, Gerber Toddler Spiral Pasta in Turkey Meat Sauce Meal, and Gerber Sitter 2nd Foods Turkey Rice Dinner Plastic Tub (hereinafter collectively referred to as "Gerber Baby Food Products").

c.     **Nurture HappyBABY Baby Food Products:** The HappyBABY products at issue consist of all HappyBABY brand baby food products including, Blueberry Rice Cakes; Cakes; Stage 3 Root Vegetables & Turkey; Apple & Broccoli Puffs; Apple Cinnamon Oat Jar; Apple Spinach Jar; Kale & Spinach Puffs; Apple Mango Beet; Pear Prune Jar; Apple Spinach Pea & Kiwi; Pea Spinach Teether; Strawberry Yogis; Sweet Potato & Carrot Puffs; Banana & Pumpkin Puffs; Apples Blueberries & Oats; CC Oats & Quinoa Cereal; Green Beans Jar; Pears Mangos & Spinach; Carrots; Apple & Broccoli Puffs; Strawberry & Beet Puffs; Mangoes; Sweet Potatoes Jar; Harvest Vegetables & Chicken; Apple Rice Cakes; Blueberry Purple Carrot Greek Yogis; Apple & Spinach; Clearly Crafted Apple Guava Beet; Sweet Potato & Carrot Puffs; Apple Pumpkin Carrots; Multi-Grain Cereal Canister; CC Oatmeal Cereal; Carrots & Peas; CC Prunes; Pears & Kale Jar; Vegetable & Beef Medley; Banana Sweet Potato Teether; Blueberry Purple Carrot Teether; and Strawberry Banana Greek Yogis (hereinafter collectively referred to as "HappyBABY Products" or "Nurture Baby Food Products").

d.     **Hain Baby Food Products**: The Hain products at issue include all baby foods sold by defendant that contain one or more of the following ingredients: organic barley flour, organic chopped broccoli, organic date paste, organic cinnamon powder, organic brown flax milled, organic yellow papaya puree, organic whole wheat fine, organic red lentils, organic oat flakes, organic oat flour; organic vitamin pre-mix, organic brown rice flour, organic whole raisins, organic soft white wheat flour, organic spelt flour, organic barley malt extract, organic yellow split pea powder, medium grain whole rice, organic butternut squash puree, and organic blueberry puree, and include, Stage 1: Baby Chicken & Chicken Broth, Stage 2: Sweet Potato and Chicken Dinner; Stage 2: Chicken & Rice (hereinafter collectively referred to as the "Hain Baby Food Products").

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 (hereinafter referred to as "CAFA") codified as 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; the number of members of the proposed Class exceeds 100; and the Plaintiff and members of the proposed Class are citizens of a state different than Defendants.

10.     This Court has personal jurisdiction over Defendant Beech-Nut Nutrition Company because its headquarters are in the State of New York, regularly conducts business in this District, has extensive contacts with this forum, and because the advertising, labeling, packing, manufacturing, sale, and distribution of Beech-Nut Baby Food Products and the misrepresentations, misleading remarks, and/or deceptive acts associated thereto, occurred, developed, or were initiated in New York.

11.     This Court has personal jurisdiction over Defendant Gerber Products Company (d/b/a Nestle Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America) because Gerber regularly conducts business in this District, has extensive contacts with this forum, and because the advertising, labeling, packing, manufacturing, sale, and distribution of Gerber Baby Food Products and the misrepresentations, misleading remarks, and/or deceptive acts in connection with Gerber Baby Food Products, occurred, developed, or were initiated in New York.

12.     This Court has personal jurisdiction over Defendant Hain Celestial Group, Inc. (d/b/a Earth's Best Organic Baby Food) because its headquarters and principal place of business are in this District and because the advertising, labeling, packing, manufacturing, sale, and distribution of Hain Baby Food Products and the misrepresentations, misleading remarks, and/or

deceptive acts in connection with Hain Baby Food Products, occurred, developed, or were initiated in this District.

13.    This Court has personal jurisdiction over Defendant Nurture, Inc. (d/b/a Happy Family Brands) because it maintains its headquarters in the State of New York, regularly conducts business in this District, has extensive contacts with this forum, and because the advertising, labeling, packing, manufacturing, sale, and distribution of Nurture Baby Food Products and the misrepresentations, misleading remarks, and/or deceptive acts in connection with Nurture Baby Food Products, occurred, developed, or were initiated in New York.

14.    This Court has personal jurisdiction over Defendant Sprout Foods, Inc. (d/b/a Sprout Organic Foods) ("Sprout"), because Sprout regularly conducts business in this District, has extensive contacts with this forum, and because the advertising, labeling, packing, manufacturing, sale, and distribution of Sprout Baby Food Products and the misrepresentations, misleading remarks, and/or deceptive acts in connection with Sprout Baby Food Products, occurred, developed, or initiated in New York.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff suffered injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, and Defendant conducts substantial business in this district and is headquartered in this district.  Defendants intentionally availed themselves to this district's laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

16.    Plaintiff Asyia Andrews is a resident of New Jersey.  Plaintiff has bought Beech-Nut, Gerber, Hain, Nurture, and Sprout Baby Food Products from Target, Shoprite, and Amazon

Fresh in various locations around her home in Union County, New Jersey. Plaintiff has regularly purchased these products since 2020 and reviewed and relied on the representations on the packaging and believed the products to be safe and suitable for babies. Plaintiff's purchases took place when third-party testing showed that Defendants' Baby Food Products contained harmful heavy metals. Plaintiff would not have purchased the products if she had known that the products were unsafe and unsuitable for babies, contained heavy metals, the levels of heavy metals in the products, testing results showed these products contained harmful levels of Toxic Heavy Metals, or that the Defendants' policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

17.     Defendant Beech-Nut is a citizen of New York, where it is incorporated and maintains its principal place of business at One Nutritious Place, Amsterdam, New York. Defendant does business throughout the United States. Defendant's Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

18.     Defendant Gerber is a citizen of Delaware, where it is incorporated, and Virginia because it maintains its principal place of business at 1812 N. Moore St. Arlington, Virginia 22209. Defendant also does business throughout the United States. Defendant's Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

19.     Defendant Hain is a citizen of Delaware, where it is incorporated, and New York because it maintains its principal place of business at 111 Marcus Avenue, Lake Success, New York. Defendant does business throughout the United States. Defendant's Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

20.     Defendant Nurture is a citizen of Delaware, where it is incorporated, and New York because it maintains its principal place of business at 139 Fulton Street, New York, New York. Defendant Nurture does business throughout the United States, and its Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

21.     Defendant Sprout is a citizen of Delaware, where it is incorporated, and New Jersey because it maintains its principal place of business at 50 Chestnut Ridge Rd, Montvale, NJ 07645. Defendant Sprout does business throughout the United States and its Baby Food Products are sold throughout the United States at large and small brick-and-mortar stores and online retailers.

## FACTUAL ALLEGATIONS

I.    **THE DANGERS OF TOXIC HEAVY METALS TO CHILDREN'S HEALTH IS WELL DOCUMENTED.**

22.     The Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared Toxic Heavy Metals dangerous to human health, particularly to babies and children, who are at the greatest risk of harm and most vulnerable to their neurotoxic effects.[7]

23.     Decades of scientific studies examining the dangers of Toxic Heavy Metals demonstrate the harmful effects of inorganic arsenic, lead, cadmium, and mercury.  Specifically, studies show that even low levels of exposure to Toxic Heavy Metals cause developmental problems in babies and children, which result in permanent decreases in IQ and economic productivity and increase risk of behavioral issues and criminal tendencies.[8]  For every IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000.[9]

---

[7] Food and Drug Administration, *Metals and Your Food* (online at www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (last visited on March 19, 2021).
[8] *Id.*
[9] Martine Bellanger et al., *Economic Benefits of Methylmercury Exposure Control in Europe: Monetary Value of Neurotoxicity Prevention* (Jan. 17, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23289875/).

24.    In 2012, the National Institute of Environmental Health Services ("NIEHS"), through its Superfund Research Program ("SRP") and NIEHS/EPA Centers for Children's Environmental Health and Disease Prevention Research ("NIEHS/EPA"), added to the growing evidence supporting the regulation of arsenic by establishing that the levels of arsenic consumed in the study were at least two or three times more than the acceptable limits set for drinking water by the U.S. Environmental Protection Agency ("EPA").[10]  Most importantly, the studies showed that baby foods, including rice cereal, contain levels of arsenic that pose a significant risk to the health of babies and children[11] and identified baby food as a potential source of arsenic exposure.[12] "Groups at potentially greatest risk are toddlers who are fed a rice syrup-based toddler formula, and potentially people who are following a gluten-free diet."[13]

25.    Infants and children are particularly vulnerable to Toxic Heavy Metals' effects because their organs are still developing.  Exposure to Toxic Heavy Metals during a baby's developmental stage can lead to "'untreatable and frequently permanent brain damage, which may result in 'reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior.'"[14]

26.    The American Academy of Pediatricians ("AAP") and the National Toxicology Program in the National Institutes of Health ("NTP/NIH") had both determined that, in young children, "even very low blood lead levels are associated with lower academic achievement, IQ,

---

[10] Gilbert-Diamond D, et al., *Rice consumption contributes to arsenic exposure in U.S. women* (December 20, 2011) (online at: https://pubmed.ncbi.nlm.nih.gov/22143778/) (last visited on March 20, 2021).

[11] Jackson BP, Taylor VF, Punshon T, Cottingham KL., *Arsenic concentration and speciation in infant formulas and first foods*. PURE APPL CHEM. 84(2):215-223 (2012) (https://pubmed.ncbi.nlm.nih.gov/22701232/) (last visited on March 19, 2021).

[12] Jackson BP, Taylor VF, Karagas MR, Punshon T, Cottingham KL., *Arsenic, Organic Foods, and Brown Rice Syrup.,* ENVIRON HEALTH PERSPECT (2012); (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3346791/) (last visited on March 19, 2021).

[13] Spivey, A., *Studies find arsenic in food adds up,* National Institute of Environmental Health Services (March 2012) (https://factor.niehs.nih.gov/2012/3/science-arsenic/index.htm) (last visited on March 19, 2021).

[14] **Exhibit A** at p. 9.

and greater incidence of attention-related behaviors and problem behaviors."[15]   Peer-reviewed literature further confirms such association between arsenic exposure and health risks in developing respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children and increased risk of developing ADHD.[16]

27.    Lead exposure presents similar long-term cognitive defects and an increased risk of developing other conditions or disorders.  As recognized by the Congressional Subcommittee, risks of exposure to lead are directly associated with "behavioral problems, decreased cognitive performance, delayed puberty, reduced postnatal growth," and ADHD development.[17]

28.    Cadmium is a known neurotoxin.  Exposure to cadmium increases the risk of developing kidney damage, decreases bone density, and damages the respiratory and skeletal systems.[18]

29.    Mercury, as explained by the WHO, "may have toxic effects on the nervous, digestive, and immune systems, and on lungs, kidneys, skin, and eyes."[19]

A.    <strong><u>There Is No Established Safe Level of Inorganic Arsenic Consumption for Babies.</u></strong>

30.    Arsenic is classified by the International Agency for Research on Cancer ("IARC") as a Group 1 carcinogen.[20]  Its harmful effects are also recognized by the WHO, which lists arsenic

---

[15] Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/) (emphasis added) (last visited on March 19, 2021).
[16] *See* Environmental Defense Fund, *EFF Report Finds Lead in 1 in 5 Baby Food Samples,* (June 15, 2017) (https://www.edf.org/media/edf-report-finds-lead-1-5-baby-food-samples) (last visited on March 19, 2021).
[17] **<u>Exhibit A</u>** at p. 11.
[18] WHO, *Cadmium,* (2019) ( https://www.who.int/ipcs/assessment/public_health/cadmium/en/ ) (https://www.who.int/ipcs/assessment/public_health/cadmium/en/) ) (last visited on March 19, 2021).
[19] Laura Reiley, N*ew Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, THE WASHINGTON POST (Feb. 4, 2021), https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/)  (last visited on March 19, 2021).
[20] https://monographs.iarc.who.int/list-of-classifications (last visited on March 19, 2021).

as one of the top ten chemicals of major public concern.  The Agency for Toxic Substances and Disease Registry ("ATSDR") recognizes arsenic as the number one substance to pose the most significant threat to human health.[21]  The inorganic forms of arsenic, referred to as arsenite and arsenate, are water-soluble and found in rice.

31.    The known health hazards associated with arsenic exposure include damage to neurodevelopment, cognitive development, respiratory system, and other neurological and immunological effects.[22]  "Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children."[23]  The most negative effects are seen in verbal performance and memory.  It is estimated that for every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."[24]

32.    Published guidelines issued by the WHO permit levels of arsenic in drinking water up to 10 parts per billion ("ppb").  Similarly, the FDA and EPA recognize the harmful effects of arsenic and have set standards limiting consumption levels to 10 ppb.[25]

33.    In 2020, the FDA issued "Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants" stating that no Baby Food Products should exceed arsenic levels of 100 ppb.[26] However, Defendants often distribute and sell products containing twice the amount recommended by the FDA.

---

[21] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on March 21, 2021).
[22] **Exhibit A** at p. 11.
[23] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/) (last visited on March 21, 2021).
[24] *Id.*
[25] FDA, *Draft Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level* (April 2016) (online at https://www.govinfo.gov/content/pkg/FR-2016-04-06/pdf/2016-07840.pdf (last visited on March 21, 2021).
[26] FDA, Guidance for Industry: Action Level for Inorganic Arsenic in Rice Cereals for Infants (Aug. 2020), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-level-inorganic-arsenic-rice-cereals-infants  (last accessed March 20, 2021).

B.    **There Is No Established Safe Level of Lead Consumption for Babies.**

34.    IARC classifies lead as a Group 1 carcinogen.[27]  Additionally, the ATSDR lists lead as the second most harmful substance that poses a significant threat to human health.[28]  Lead is also recognized by the WHO as a major public health concern.[29]

35.    Numerous governmental agencies, including the FDA, recognize the significant health effects that lead can have on children and infants.  High levels of lead exposure can seriously harm children's development and health, specifically the brain and nervous system.  Neurological deficits from the high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ.  Additionally, because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.[30]

36.    The EPA, WHO, the Centers for Disease Control and Prevention ("CDC") and the AAP unanimously agree that there is no established "safe level of lead (Pb) in a child's blood; even low levels of Pb in the blood can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia."[31]  Moreover, numerous scientific studies establish a "significant association between early childhood lead exposure and decrease standardized test performance, with lead exposure strongly linked to an adverse effect on academic

---

[27] https://monographs.iarc.who.int/list-of-classifications (last visited on March 19, 2021).

[28] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on March 21, 2021).

[29] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on March 21, 2021).

[30] FDA, *Lead in Food, Foodwares, and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (last visited on March 19, 2021).

[31] Congressional Report at p. 10; *see also*, Valerie Zartarian, et al., *Children's Lead Exposure: A Multimedia Modeling Analysis to Guide Public Health Decision-Making* (Sept. 12, 2017) (https://ehp.niehs.nih.gov/doi/10.1289/ehp1605) (last visited March 5, 2021); https://www.epa.gov/lead/learn-about-lead; *see also*, Philippe Grandjean, *Even Low-Dose Lead Exposure Is Hazardous* (Sept. 11, 2010) (online at https://pubmed.ncbi.nlm.nih.gov/20833288/).

[31] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last visited on March 19, 2021).

achievement."[32]    Peer-reviewed studies also establish a significant association between lead exposure and ADHD.[33]

37.    Despite these well-known adverse health effects, the FDA fails to regulate levels of lead in Baby Food Products, allowing Defendants to set their limits, which often include exceedingly dangerous amounts.

### C.    There Is No Established Safe Level of Cadmium Consumption for Babies.

38.    IARC classifies cadmium as a Group 1 carcinogen.[34]    Additionally, the ATSDR lists cadmium as the seventh most substance to pose the most significant threat to human health[35] and recognized by the WHO as a major public health concern.[36]

39.    Cadmium has no physiological function in the human body and is known as a neurotoxin associated with decreases in IQ and the development of ADHD.[37]    Peer-reviewed literature documents the harmful effects cadmium exposure has on children's Full-Scale IQ, particularly in boys, who, historically, have fewer IQ points than other boys without cadmium exposure.[38]    Moreover, according to a new study led by Harvard University researchers, children with higher cadmium levels are three times more likely to have learning disabilities and participate in special education.[39]

---

[32] **Exhibit A** at p. 11 (internal citation omitted).
[33] *Id.*
[34] https://monographs.iarc.who.int/list-of-classifications (last visited on March 20, 2021).
[35] *ATSDR's Substance Priority List* https://www.atsdr.cdc.gov/spl/index.html (last visited on March 21, 2021).
[36] https://apps.who.int/iris/bitstream/handle/10665/329480/WHO-CED-PHE-EPE-19.4.3-eng.pdf?ua=1 (last visited on March 21, 2021).
[37] *Id.* at p. 12.
[38] *Id.*
[39] Marla Cone, *Is Cadmium as Dangerous for Children as Lead?,* SCIENTIFIC AMERICAN (Feb.2012), (online at https://www.scientificamerican.com/article/is-cadmium-as-dangerous-for-children-lead/) (last visited March 21, 2021).

40.     Despite well-known adverse health effects, the FDA fails to regulate cadmium in Baby Food Products, allowing Defendants to set their own limits, which dangerously exceed safe consumption.

**D.     There Is No Established Safe Level of Mercury Consumption for Babies.**

41.     The WHO warns that mercury "may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin, and eyes"[40] and considers mercury "one of the top ten chemicals or groups of chemicals of major public health concern."[41]

42.     Despite well-known adverse health effects, the FDA fails to regulate mercury levels in Baby Food Products, allowing Defendants to set their limits, which dangerously exceed safe consumption.  Mercury is the number three substance on ATSDR's list of importance in the environment, potentially posing a significant threat to human health.  As with inorganic arsenic, lead, and cadmium, Healthy Babies Bright Futures advocates for a goal of zero levels of mercury in baby food.  Outside the baby food context, the FDA has set a limit of 2 ppb of mercury in bottled water, while the EPA has set a limit of 2 ppb for drinking water.  A study that evaluated the published epidemiological research articles related to mercury exposure, determined that in the context of exposure in vitro, "mercury… has been consistently associated with subsequent adverse neuro-development."[42]

**II.     DEFENDANTS' BABY FOOD PRODUCTS CONTAIN DANGEROUS LEVELS OF TOXIC HEAVY METALS.**

**A.     Defendants' Baby Food Products Contain Arsenic.**

---

[40] WHO, *Mercury and health* (https://www.who.int/news-room/fact-sheets/detail/mercury-and-health#:~:text=Health%20effects%20of%20mercury%20exposure&text=The%20inhalation%20of%20mercury%20vapour,induce%20kidney%20toxicity%20if%20ingested) (last visited on March 19, 2021).
[41] WHO, *Lead Poisoning and Health* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last visited on March 18, 2021).
[42] Margaret R. Karagas, et al., E*vidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (https://pubmed.ncbi.nlm.nih.gov/22275730/) (last visited on March 18, 2021).

16

43.     The Congressional Report states: "Internal company test records obtained by the Subcommittee confirm that all responding baby food manufacturers sold baby foods tainted by high levels of toxic heavy metals."[43]

44.     There is no established safe level for inorganic arsenic consumption by babies. However, since the FDA, EPA, WHO, and European Union ("EU") have all set a maximum level of inorganic arsenic at 10 ppb, the Congressional Subcommittee took this value into consideration during their analysis.[44]

45.     Health experts, including the AAP, Consumer Reports, and the Environmental Defense Fund ("EDF"), all advocated for a maximum level of 1 ppb instead of 10 ppb.  EDF is the world's leading nonprofit environmental group that focuses on environmental health hazards. Consumer Reports is a nonprofit organization that advocates for consumers and regarding Toxic Heavy Metals.

46.     Accordingly, the Congressional Subcommittee used 10 ppb as the estimated maximum level.  The Congressional Report determined Defendants each manufactured and sold Baby Food Products with levels grossly exceeding all existing standard limits, including those set for juice and candy, which allow a maximum measurement of 50 ppb and 100 ppb, respectively.[45]

47.     <u>Beech-Nut</u>.  Beech-Nut does not test its finished products and instead only tests its ingredients.  Nevertheless, Beech-Nut ingredients' testing confirms that the company sold Beech-Nut Baby Food Products with high levels of arsenic.  Most importantly, the Congressional Report discovered Beech-Nut's routine pattern of disregarding arsenic testing results altogether, and

---

[43] **<u>Exhibit A</u>** at p. 13.
[44] *Id.*
[45] *Id.* at pp. 13-21.

instead using the ingredients in any way Beech-Nut saw fit regardless of the presence of Toxic Heavy Metals.[46]

*Beech-Nut, Raw Material Heavy Metal Testing (Excerpted Entries)*[45]

| Date | Commodity | Arsenic Result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|
| 9/19/2018 | Amylase | 913.40 | N/A | Y |
| 4/26/2018 | Amylase | 741.10 | N/A | Y |
| 10/7/2017 | BAN 800 | 710.90 | <3000 | Y |
| 11/29/2017 | Alpha Amylase | 679.00 | N/A | Y |
| 10/12/2017 | Amylase | 645.10 | N/A | Y |
| 8/20/2019 | Sebamyl 100 | 583.60 | N/A | Y |
| 3/6/2018 | Org. Rice Flour | 570.00 | ≤100(inorg) | Y |
| 6/7/2019 | Enzyme | 499.30 | N/A | Y |
| 12/20/2017 | BAN 800 | 465.20 | <3000 | Y |
| 1/14/2019 | Enzyme | 442.30 | N/A | Y |
| 10/23/2017 | BAN 800 | 401.40 | <3000 | Y |

48.     <u>Gerber</u>.  Gerber does not test its finished products and instead only tests its ingredients, although the Congressional Report indicates that Gerber does not always provide inorganic arsenic results.  Nevertheless, the results for conventional rice flour proved that Gerber routinely uses flour with over 90 ppb inorganic arsenic.  The results further demonstrated Gerber's use of five rice flour batches that contained 98 ppb arsenic, and 67 batches with more than 90 ppb arsenic.[47]

49.     <u>Hain</u>.  Hain rarely tests its finished products, and typically will only tests its ingredients.  Nevertheless, testing of Hain ingredients proves that the company sold products with significant amounts of arsenic.  As noted in the Congressional Report, the small sample of finished product tested detected 129 ppb inorganic arsenic.  The Congressional Report also revealed that: (a) Hain routinely uses ingredients that contain high levels of arsenic up to 309 ppb, and (b) at least 24 ingredients contained more than 100 ppb arsenic.[48]

---

[46] *Id.* at pp. 17-19; *see also*, Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019), attached hereto as **Exhibit B**.
[47] **Exhibit A** at pp. 19-21.
[48] *Id.* at pp. 15-17.

50.  _Nurture_.  Nurture is the only manufacturer to test its finished products.  However, testing of Nurture products still proves that the company sold products with significant amounts of arsenic.  Specifically, the results and internal documents revealed: (a) Nurture sold finished Baby Food Products after testing showed they contained as much as 180 ppb inorganic arsenic; (b) over 25% of the tested Nurture Baby Food Products exceeded 100 ppb inorganic arsenic; and (c) on average, Nurture baby food on store shelves has nearly 60 ppb inorganic arsenic.[49]

***Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)[89]***

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 3/16/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 11/16/2018 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Purple Carrot & Blueberry Puffs | Baby 7+ Months | 2/15/2019 | Inorganic Arsenic | 100 | 150 | ppb | 11/17/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Sweet Potato & Carrot Puffs | Baby 7+ Months | 1/19/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

51.  The Congressional Report provides the following summary of significant issues found during the investigation:[50]

***Summary of Nurture's Inorganic Arsenic Results***

| |
|---|
| **180 ppb – Nurture's product with the highest amount of inorganic arsenic:  Apple & Broccoli Puffs.** |
| **>100 ppb – Over 25% of the baby food products that were tested for inorganic arsenic had over 100 ppb inorganic arsenic.** |
| **59.54 ppb – Average amount of inorganic arsenic in all baby food products tested for inorganic arsenic.** |
| **>50 ppb – Over 50% of Nurture's baby food products that were tested for inorganic arsenic contained over 50 ppb inorganic arsenic.** |

---

[49] _Id._ at pp. 14-15.
[50] _Id._

**B. Defendants' Baby Food Products Contain Lead.**

52.     There is no federal standard for lead in baby food.  However, standards for the measurement of lead in drinking water have been imposed by several agencies, including the FDA (limit of 5 ppb), WHO (limit of 10 ppb), and EPA (15 ppb).  Additionally, the FDA provides guidance for lead measurements in juice and candy with a maximum level of 100 ppb.[51]

53.     Health experts, including the AAP, Consumer Reports, and the EDF advocated for a maximum limit of 1 ppb in baby food.[52]

54.     Accordingly, the Congressional Subcommittee used the following guidance when reviewing Defendants' internal test results:

*Proposed and Existing Lead Standards*

| Group or Agency | Standard |
|---|---|
| Environmental Defense Fund | 1 ppb, especially for baby food |
| Consumer Reports | 1 ppb in fruit juices |
| American Academy of Pediatrics (AAP) | 1 ppb for water fountains in schools |
| FDA | 5 ppb for bottled water |
| World Health Organization | 10 ppb provisional guideline |
| EPA | 15 ppb for drinking water (action level) |
| European Union (EU) | 20 ppb for "infant formulae and follow-on formulae" |
| FDA | 50 ppb for juice<br>100 ppb for candy |

55.     The Congressional Report determined that all Defendants manufactured and sold Baby Food Products with levels exceeding all existing standards for lead, including those set for juice and candy, which allow a maximum measurement of 50 ppb and 100 ppb respectively.

56.     Beech-Nut.  Beech-Nut does not test its finished products and instead only tests the ingredients used.  Nevertheless, Beech-Nut ingredients testing proves that the company sold products with significant amounts of lead that exceed the existing standards for water, juice, and

---

[51] **Exhibit A** at p. 21.
[52] *Id.*

candy.  Specifically, the results revealed: (a) ingredients, such as cinnamon, contained 886.9 ppb lead, (b) 57 ingredients had more than 20 ppb lead, (c) 89 elements held more than 15 ppb lead, and (d) 483 ingredients contained more than 5 ppb lead.[53]

57.    <u>Gerber</u>.  Gerber does not test its finished products and instead, only tests the ingredients used.  Nevertheless, testing of Gerber ingredients prove that the company sold products with significant amounts of lead that exceed the existing standards for water, juice, and candy.  Specifically, the results revealed: (a) Gerber produced limited lead testing result but enough to indicate that its sweet potatoes and juices contained dangerous levels of lead, (b) conventional sweet potatoes contained 480 ppb lead, (c) 12 batches of sweet potato contained more than 20 ppb, and (d) the average amount contained in juice concentrates was 11.2 ppb.[54]

58.    <u>Hain</u>.  Hain does not test its finished products and instead only tests the ingredients used.  Nevertheless, testing of Hain ingredients proves that the company sold products with significant amounts of lead that exceed the existing standards for water, juice, and candy.  Specifically, the results revealed: (a) 6 ingredients contained more than 200 ppb lead, (b) 88 ingredients contained more than 20 ppb lead, (c) 115 ingredients contained more than 15 ppb lead, and (d) 27% of ingredients contained more than 5 ppb lead.[55]

59.    <u>Nurture</u>.  Nurture is the only manufacturer to test its finished products.  However, testing of Nurture products still proves that the company sold products with significant amounts of lead that exceed the existing standards for water, juice, and candy.  Specifically, the results revealed: (a) Nurture sold products that tested as high as 641 ppb lead, over six times higher than

---

[53] **<u>Exhibit A</u>** at pp. 23-26.
[54] *Id.* at pp. 27-28.
[55] *Id.* at pp. 26-27.

its internal limit of 100 ppb, (b) 5 products sold contained more than 50 ppb lead, (c) 16 products sold contained more than 20 ppb lead, and (d) 39 products sold contained more than 10 ppb lead.[56]

### C. **Defendants' Baby Food Products Contain Cadmium.**

60.     There is no federal standard for cadmium in baby food.  However, standards for cadmium measurements in drinking water have been imposed by several agencies, including the FDA (limit of 5 ppb), WHO (limit of 3 ppb), and EPA (5 ppb).[57]

61.     Nonprofit organizations have also issued recommendations.  Consumer Reports recommends a limit of 1 ppb for cadmium in fruit and juices, while Healthy Babies Bright Futures suggests 0 ppb.[58]  Consumer Reports and the EDF, advocate for levels of less than 1 ppb.[59] Accordingly, the Congressional Subcommittee used the following guidance when reviewing Defendants internal test results:

*Proposed and Existing Cadmium Standards*

| Group or Agency | Standard |
| --- | --- |
| Consumer Reports | 1 ppb in all fruit juices |
| World Health Organization | 3 ppb for drinking water |
| EPA | 5 ppb for drinking water |
| FDA | 5 ppb for drinking water |
| European Union (EU) | 5-20 ppb for infant formulae |

62.     The Congressional Report determined Defendants each manufactured and sold Baby Food Products with levels exceeding all existing recommended limits.

63.     <u>Beech-Nut</u>.  Beech-Nut does not test its finished products and instead only tests the ingredients used.  Nevertheless, testing of Beech-Nut ingredients proves that the company sold products with significant amounts of cadmium that exceed the existing standards.  Specifically,

---

[56] *Id.* at pp. 22-23.
[57] *Id*. at p. 29.
[58] *Id.*
[59] *Id.*

the results revealed: (a) cinnamon contained 344.5 ppb cadmium, (b) 20 ingredients contained more than 100 ppb cadmium, and (c) 105 ingredients contained more than 20 ppb cadmium.[60]

64.    <u>Gerber</u>.  Gerber does not test all its ingredients for cadmium.  Nevertheless, those Gerber does test prove that the company sold products with significant amounts of cadmium that exceed the existing standards.  Specifically, the results revealed: (a) multiple batches of carrots sold contained 87 ppb cadmium, (b) 75% of carrots sold contained more than 5 ppb cadmium, and (c) 12 batches of sweet potato contained more than ppb cadmium.[61]

65.    <u>Hain</u>.  Hain does not test its finished products and instead only tests the ingredients used.  Nevertheless, testing of Hain ingredients proves that the company sold products with significant amounts of cadmium that exceed the existing standards.  Specifically, the results revealed: (a) 14 ingredients contained more than 100 ppb cadmium, (b) barley flour contained 260 ppb cadmium, and (c) 102 ingredients contained more than 20 ppb cadmium.[62]

66.    <u>Nurture</u>.  Nurture is the only manufacturer to test its finished products.  Nevertheless, testing proves that the company sold products with significant amounts of cadmium that exceeded the existing standards.   Specifically, the results revealed: (a) products tested as high as 641 ppb lead, over six time higher than its internal limit of 100 ppb cadmium, (b) multi-grain cereal was sold with 49 ppb cadmium, and (c) 125 products sold contained more than 5 ppb cadmium.[63]

### D.  <u>Defendants' Baby Food Products Contain Mercury.</u>

---

[60] *Id.* at pp. 29-30; *see also*, Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) attached hereto as **<u>Exhibit C</u>**.

[61] **<u>Exhibit A</u>** at p. 32; *see also*, Gerber, *Gerber Products Company Test Results* (Dec. 9, 2019), attached hereto as **<u>Exhibit D</u>**.

[62] **<u>Exhibit A</u>** at pp. 30-31; *see also*, Hain, *Raw Material Pre-Shipment Test Data History* (Dec. 11, 2019), attached hereto as **<u>Exhibit E</u>**.

[63] **<u>Exhibit A</u>** at p. 31; *see also*, **<u>Exhibit C</u>**.

67.     There is no federal standard for mercury in baby food.  However, standards for mercury measurements of 2 ppb in drinking water have been imposed by the EPA.  Neither the FDA nor the WHO have provided any guidance.[64]

68.     Consumer advocate, Healthy Babies Bright Futures recommend a level of 0 ppb.

69.     Accordingly, the Congressional Subcommittee used the EPA's limit of 2 ppb as guidance when reviewing Defendants' internal test results.  The Congressional Report found:

a.     <u>Beech-Nut</u>: Beech-Nut does not test its ingredients or finished products for mercury.

b.     <u>Gerber</u>: Gerber does not test its ingredients or finished products for mercury.

c.     <u>Hain</u>: Hain only tests its ingredients and does not test the finished products for mercury.

d.     <u>Nurture</u>: Nurture is the only manufacturer to test its finished products.  However, testing of Nurture products proves that the company sold products with amounts of mercury that significantly exceed the existing standard limits.  Specifically: (a) 1 finished product sold contained 10 ppb mercury, (b) 2 finished products contained more than 7.3 ppb mercury, and (c) 57 finished products contained more than 2 ppb mercury.[65]

## III.    FOR NEARLY A DECADE, DEFENDANTS HAVE DISREGARDED AND IGNORED REPORTS DETECTING THE PRESENCE OF TOXIC HEAVY METALS IN THEIR BABY FOOD PRODUCTS.

70.     For more than a decade, Defendants have possessed medical and scientific data linking childhood exposure to Toxic Heavy Metals to long-term and irreversible health and cognitive issues.  In 2012, Consumer Reports, a nonprofit organization that advocates for consumers, detected elevated levels of Toxic Heavy Metals in Beech-Nut Homestyle Rice, Gerber

---

[64] **Exhibit A** at p. 48.
[65] **Exhibit A** at pp. 32-33.

SmartNourish Organic Brown Rice cereal and Hain Earth's Best Organic Whole Grain Rice cereal. Gerber's cereal contained the highest level of arsenic present in its products, ranging between 97.7 ppb and 329 ppb.[66]

71.     On December 6, 2017, Happy Babies Bright Futures issued a report finding rice-based infant cereals, including Beech-Nut and Gerber cereals, contained 84% more arsenic than non-rice multigrain products ("Arsenic Report").[67]

72.     In 2017, EDF, issued a report finding lead in 1 in 5 samples of baby food. The EDF based its analysis on data from 2,164 baby food samples collected by the FDA between 2003 and 2013,[68] as part of the agency's Total Diet Study ("TDS") program, which has monitored the United States population's average annual dietary intake of levels of certain contaminants and nutrients since the 1960s.[69] Lead was most commonly found in baby foods that contained fruit juices, sweet potatoes, carrots, arrowroot cookies, and teething biscuits. Overall, the EDF "found that more than 1 million children consume more lead than FDA's limit" and estimated that the removal of lead in baby food "would save society more than $27 billion annually in total lifetime earnings from saved IQ points."[70] The EDF also recommended that manufacturers set a goal of less than 1 ppb of lead

---

[66] Consumer Reports, *Arsenic in your food* (November 2012) (https://www.consumerreports.org/cro/magazine/2012/11/arsenic-in-your-food/index.htm) (last visited on March 19, 2021).
[67] Healthy Babies Bright Futures, *Arsenic in 9 Brands of Infant Cereal* (December 2017) (online at https://www.healthybabycereals.org/sites/healthybabycereals.org/files/2017-12/HBBF_ArsenicInInfantCerealReport.pdf) (last visited on March 19, 2021).
[68] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (online at https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited March 19, 2021).
[69] To conduct TDS, the FDA purchases samples of diverse types of foods four times a year, in different regions of the United States. The food samples are prepared in the same manner consumers typically would and analyze for levels of chemical contaminants and chemical elements, including Toxic Heavy Metals. The FDA uses the results to calculate the estimated consumption of each contaminant and nutrient annually. Results of the TDS, from 1991 to present, are publicly available on the FDA's website (https://www.fda.gov/food/total-diet-study/total-diet-study-fact-sheet-industry)
[70] Environmental Defense Fund, *Lead in food: A hidden health threat* (June 15, 2017) (online at https://www.edf.org/sites/default/files/edf_lead_food_report_final.pdf) (last visited March 19, 2021).

in baby food and test more frequently during processing to identify additional lead sources and take appropriate corrective actions.

73.      On August 16, 2018, Consumer Reports revealed the findings of its analysis of 50 nationally distributed baby food products manufactured by Defendants, Beech-Nut, Gerber, Hain, Nurture, and Sprout, and four other manufacturers.  Consumer Reports found measurable levels of Toxic Heavy Metals in all 50 products, noting that about two-thirds (68%) contained concerning amounts of at least one Toxic Heavy Metals, and 15 of the foods posed a potential health risk by eating one serving of the product or less, per day.  The results further established "all the samples of Beech-Nut Classics Sweet Potatoes, Earth's Best Organic Sweet Potatoes, and Gerber Turkey & Rice had concerning levels of lead."[71]

74.      In April 2019, Healthy Babies Bright Futures published a report finding that 95% of the products tested contained dangerous amounts of Toxic Heavy Metals.[72]  Notably, Healthy Babies Bright Futures' Report found Toxic Heavy Metals in the same Beech-Nut, Gerber, Hain, Nurture, and Sprout Baby Food Products at issue in this case.  For example, Beech-Nut, Gerber, and Hain rice-based cereal products contained significant levels of arsenic, lead, and cadmium:[73]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Infant cereal: rice | | | | | | | | | |
| Beech-Nut | Rice Single Grain Baby Cereal - Stage 1, from about 4 months | Cereal - rice | 117 | 86 | 3.5 | 5.4 | 0.582 | Charlottesville, VA | Wegmans |
| BioKinetics | BioKinetics Brown Rice Organic Sprouted Whole Grain Baby Cereal | Cereal - rice | 353 | 144 | 3.1 * | 31.7 | 2.32 | Washington, DC | amazon.com |
| Earth's Best | Whole Grain Rice Cereal | Cereal - rice | 138 | 113 | 22.5 | 14.7 | 2.41 | San Diego, CA | 99 Cents Only Stores |
| Earth's Best | Whole Grain Rice Cereal | Cereal - rice | 126 | 107 | 17.8 | 13.4 | 2.19 | Portland, ME | Hannaford |
| Gerber | Rice Single Grain Cereal | Cereal - rice | 106 | 74 | 3.9 | 11.1 | 1.79 | Gambell, AK | ANICA Native Store |

---

[71] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (August 16, 2018) (https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/) (last visited March 19, 2021).
[72] Healthy Babies Bright Futures, *What's in my Baby's Food?*  (December 2017) (online at https://www.healthybabyfood.org/sites/healthybabyfoods/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf) (last visited March 19, 2021).
[73] *Id*. at 19.

75.    Toxic Heavy Metals detected in HappyBABY products, including HappyBABY Superfood Puffs Organic Grain Snack contained arsenic levels up to 295 ppb, 91 ppb of inorganic arsenic, 3.7 ppb of lead, and 12.2 ppb of cadmium:[74]

| Snacks - Puffs | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comforts (Kroger) | Blueberry Little Puffs Cereal Snack | Snack - rice puffs | 83.3 | 61 | 8.5 | 36.9 | 0.835 | Cincinnati, OH | Kroger |
| Earth's Best | Sesame Street Organic Peanut Butter Baked Corn Puffs | Snack - puffs, non-rice | < 4.4 | -- | 1.3 * | 26 | < 0.278 | Washington, DC | amazon.com |
| HappyBABY | Superfood Puffs - Apple & Broccoli Organic Grain Snack - for crawling baby | Snack - rice puffs | 266 | 83 | 8.2 | 11 | 2.16 | Albany, NY | buybuyBABY |
| HappyBABY | Superfood Puffs Organic Grain Snack - Sweet Potato & Carrot | Snack - rice puffs | 295 | 91 | 3.7 | 12.2 | 1.94 | Washington, DC | amazon.com |
| Gerber | Puffs Banana Cereal Snack - Crawler 8+ months | Snack - rice puffs | 44.5 | -- | 9.2 | 16 | 0.376 * | Houston, TX | 99 Cents Only Stores |
| O Organics | Organic Puffs - Apple Strawberry | Snack - rice puffs | 200 | 122 | 7.5 | 15.2 | 3.29 | Washington, DC | Safeway |

76.    The Healthy Babies Bright Futures Report results are consistent with the FDA's findings in 2017, in which the FDA detected one or more Toxic Heavy Metal in 33 of 39 baby food samples.[75]   Additionally, while the FDA proposed limiting inorganic arsenic in infant rice cereals to 100 ppb, the Healthy Babies Bright Futures report noted that four of the seven infant rice cereals analyzed during its study detected amounts exceeding 100 ppb.[76]

IV.    **DEFENDANTS' ADVERTISEMENTS FALSELY CLAIM THAT DEFENDANTS' BABY FOOD PRODUCTS ARE SAFE, AND FRAUDULENTLY OMIT ALL MATERIAL INFORMATION ABOUT TOXIC HEAVY METALS**

A.    **Beech-Nut's Deceptive Advertisements and Statements.**

77.    Beech-Nut manufactures, distributes, and sells Baby Food Products under the brand name "Beech-Nut."   The company proudly declares to consumers that it has "taken the responsibility to provide safe, nutritious food as our highest purpose for over 130 years."[77]

78.    Beech-Nut uniformly markets, advertises, represents, and warrants its products as safe and suitable for babies' consumption and in compliance with FDA guidelines.

---

[74] *Id.* at 26.
[75] *Id.* at 6.
[76] *Id.*
[77] https://www.beechnut.com/food-quality-safety/ (last visited on March 18, 2021).

79.    Beech-Nut misleads consumers by representing that the company performs tests for "up to 255 contaminants to confirm that every shipment meets [its] strict quality standards." However, as noted in the Congressional Report, Beech-Nut does not test for mercury, and has among the lowest standards in the industry for lead and cadmium.[78]







80.    Beech-Nut fails to disclose to the consumer that it has adopted a reckless policy that only tests ingredients used in products rather than the finished product.

81.    Consumers reasonably rely upon Beech-Nut's statements, representations, and advertisements regarding the safety of its product.  They would have no reason to suspect the presence of Toxic Heavy Metals in Beech-Nut products or take necessary precautions.

82.    Beech-Nut's products' labels include a representation that the company does not use harmful ingredients such as cancer-causing bisphenol A ("BPA") but fails to disclose or warn consumers that Beech-Nut's products contain Toxic Heavy Metals.  Instead, Beech-Nut maintains that its products are of the highest quality and fails to warn consumers of the dangers.

---

[78] **Exhibit A** at pp. 31, 37-38.

83.    The following image is a representative example of Beech-Nut's "Non-GMO" verification and misleading label for Beech-Nut Sweet Potato:



84.    The following image is a representative example of Beech-Nut Single Grain Rice Baby Cereal's label:



85.    Despite unequivocal proof of Toxic Heavy Metals in its foods, Beech-Nut

continues to mislead its customers in its response to the Congressional Report's findings:

**The health and safety of your children is at the heart of what we do.**

We know moms, dads, and caregivers depend on our commitment to safety and quality to help keep their children thriving. As parents ourselves, we are proud to feed our own children Beech-Nut products and have taken the responsibility to provide safe, nutritious food as our highest purpose for over 130 years.

We understand the recent Congressional Report and news stories have been unsettling to parents. We must continue to reduce heavy metal contaminants and continue developing science-based standards for limiting heavy metals found in baby food ingredients—In fact, for several years, Beech-Nut have worked with the U.S. Food and Drug Administration, through the Baby Food Council, on this very issue.

On March 5, 2021, the FDA issued an update to provide parents and caregivers information about the **safety** of current baby food and the importance of serving a **variety** of healthy foods to infants and toddlers. Here are some **key takeaways** from this FDA update that may address your biggest questions:

- **Is my baby's food safe?**  Yes, the food is safe. The FDA regulates and routinely monitors levels of heavy metals in all foods. If the FDA finds that any foods pose a health risk, it takes steps to remove those foods from the market.

- **Is homemade baby food safer for my baby?**  Making food at home for your child likely does not reduce his or her potential exposure to metals. Rather, it may result in higher exposures, as the ingredients you use are not tested. Food manufacturers implement sophisticated testing tools & procedures that help detect & select ingredients with lower concentrations of elements, such as heavy metals.

- **Should I throw out Beech-Nut baby food?**  The FDA does not advise parents and caregivers to throw out packaged foods for babies and young children.

- **Should I eliminate certain foods from my child's diet?**  The FDA advises that eliminating food groups from your child's diet could lead to deficiencies in certain nutrients and potential poor health outcomes. Before eliminating any food items, parents and caregivers should speak with their child's pediatrician about a diet that includes a variety of age-appropriate, healthy foods to ensure that the child is getting the nutrients he or she needs.

- **Where do heavy metals come from?**  Heavy metals are found naturally in our environment. They are in the soil, the water, the air—and are therefore unavoidable in our general food supply.

**B.    Gerber's Deceptive Advertisements and Misleading Statements.**

86.    Gerber manufactures, distributes, sells food for babies, and offers various food products such as traditional baby food purees, baby cereals, puffs, and rice cakes.

87.     The company proudly promises, "[t]he health and safety of your little one has been and will always be our highest priority."[79]  Moreover, the company slogan is "Anything for Baby."



88.     Gerber uniformly markets, advertises, represents, and warrants its products as safe and suitable for babies' consumption and in compliance with FDA guidelines.   Gerber's "Commitment to Quality" statement states, "Good enough is never enough.  We meet the standards of the FDA, but we don't stop there.  We go further.  We have among the strictest standards in the world.  From farm to highchair, we go through over 100 quality checks for every jar."[80]

89.     Gerber markets and advertises Gerber "Single Grain Rice Cereal" as containing ingredients that "support brain development."  The following image is a representative example of this product.

---

[79] https://www.gerber.com/commitment-to-quality (last visited on March 20, 2021).
[80] *Id.*




90.     Despite unequivocal proof of Toxic Heavy Metals in its foods, Gerber continues to mislead its customers in its response to the Congressional Report's findings:

## An Important Message From Gerber

February 18, 2021

At Gerber, babies are our highest priority. Parents can rest assured our products are healthy and safe.

The standards we have in place for the safety and quality of our baby foods are industry-leading, and among the strictest in not just the U.S., but the world. We meet the standards of the FDA, but we don't stop there. We meet or exceed all existing government requirements, and where they don't currently exist, we have established our own high standards based on the latest food safety guidance.Gerber foods receive thorough oversight at all levels of the growing and the production process.

Heavy metals occur naturally in the soil and water in which crops are grown. As stated in our 2019 response to the Congressional Inquiry, we take many steps to minimize their presence. We prioritize growing locations based on climate and soil composition. We approve fields before crops are planted based on soil testing. We rotate crops according to best available science. Throughout the process we test produce, water, ingredients and our foods to ensure we are delivering on our promise to deliver high-quality and tasty baby food. From farm to highchair, we go through over 100 quality checks for every jar.

C.    **Hain (Earth's Best)**

91.    Hain manufactures, distributes, and sells food for babies under the brand name "Earth's Best."  Hain promises consumers to produce "pure, quality products."

92.    Hain uniformly markets, advertises, represents, and warrants its products as safe and suitable for babies' consumption and in compliance with FDA guidelines.

93.    The Congressional Report uncovered a PowerPoint presentation dated August 1, 2019, that Hain sent to the FDA in private, which revealed its corporate policies to test only

ingredients, not final products, thereby allowing Hain to underrepresent the levels of Toxic Heavy

Metals in its final products.[81]  The Congressional Report stated in response:

> That policy recklessly endangers babies and children and prevents
> the companies from even knowing the full extent of the danger
> presented by their products. As the Hain presentation lays bare,
> ingredient testing does not work. Hain's finished baby foods had
> more arsenic than their ingredients 100% of the time—28-93% more
> inorganic arsenic. That means that only testing ingredients gives the
> false appearance of lower-than-actual toxic heavy metal levels.[82]

94.     Hain's presentation admits that its testing results do not provide accurate data

reflecting the amount of arsenic in their products.

95.     Despite repeated testing confirming the presence of Toxic Heavy Metals and Hain's

own admission that its products contain levels that far exceed safe levels, Hain has failed to

disclose any information to consumers or update its warning label.  Instead, Hain continues to

reassure its customers that Hain Baby Food Products are safe:

---

[81] Hain, *PowerPoint Presentation to Food and Drug Administration: FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf), attached hereto as **Exhibit F**.
[82] **Exhibit A** at pp. 56-57.

When that moment does arrive that your little one is ready to begin exploring the goodness of whole grains, the Earth's Best® brand has a variety of baby cereals carefully crafted to ensure every bite counts-from essential nutrients to support growth and development, plus energy to help your tiny tastemaker master the high chair and beyond.

Here are 4 things to know and love about our thoughtfully chosen Earth's Best Organic® cereal ingredients.

1. **We source USDA Certified Organic ingredients.** Our ingredients are carefully sourced from organic family farms and growers we know and trust. This means that every bite is filled with sustainable ingredients, grown without potentially harmful pesticides or herbicides. Our cereals are always non-GMO, and never contain any artificial colors, artificial flavors or artificial preservatives.
2. **Made from wholesome grains nutritionists and pediatricians love.** At the Earth's Best® brand, we're parents, too. And we know that every baby's journey to greatness is different. That's why we feature 3 easy-to-digest varieties, featuring high-quality organic ingredients to help moms, dads and caregivers meet the moment in their own perfect way, including:

- *Whole Grain Oatmeal Cereal.* Naturally gluten-free and 100% whole grain, oatmeal has 9% DV protein, which helps keeps baby satisfied.
- *Whole Grain Multi-Grain Cereal.* Made from a nourishing blend of organic whole grain oats, barley and spelt, perfect to introduce your baby a variety of flavorful whole grains.
- *Rice Cereal.* Exceptionally gentle as a start, our organic rice is naturally gluten free.

3. **Thoughtfully fortified.** Tiny bites can still deliver big nutrients: All of our Earth's Best Organic® cereals are iron fortified for infant growth and development. Babies are born with iron stores to last the first four to six months of life. After that the AAP recommends offering iron-rich foods, like Earth's Best® Iron Fortified Organic Baby Cereal, as some of baby's first foods, to help prevent iron deficiency.
4. **Always exceeding the highest standards of safety and purity.** Since our very first jar of organic baby food was hand crafted nearly 35 years ago, we hold strong to our commitment to keep all Earth's Best® foods safe – we reject ingredients annually because they do not meet our specifications. Along with our participation with the Baby Food Council, The Hain Celestial Group is committed to the goals of continuing to work toward minimizing exposure to environmental contaminants associated with common baby food commodities.

96.     Consumers reasonably rely upon Hain's statements, representations, and advertisements regarding the safety of its products. They would have no reason to suspect the presence of Toxic Heavy Metals in Hain Baby Products or take necessary precautions.

97.     Consumers reasonably rely upon Hain's statements, representations, and advertisements regarding the safety of its products. They would have no reason to suspect the presence of Toxic Heavy Metals in Hain's Baby Food Products or take necessary precautions.

98.     The following image is a representative example of Hain's "Earth's Best Whole Grain Rice Cereal." Hain's label states: "All Babies Begin Life 100% Pure . . . Feed Them Accordingly." Additionally, the back of the product includes: "From the first spoonful on, you can be sure your baby's rapidly developing little body is getting only pure, healthy, organic, nutrition." Nowhere on the package does Hain disclose the product contains Toxic Heavy Metals.

36

 

99.   The following image is a representative example of Hain's "Non-GMO" verification and misleading label for Earth's Best Organic Sweet Potato:



100.    Hain's statement in response to the Congressional Report's findings is as follows:



**Statement in Response to Congressional Report**

February 5, 2021

**February 4, 2021**

Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies. Our rigorous internal standards and testing procedures ensure Earth's Best products meet or exceed the current federal guidelines.  In addition, we work collaboratively with the Baby Food Council (composed of other manufacturers, the Environmental Defense Fund and Cornell University), the Food and Drug Administration and the Department of Agriculture to continuously refine and improve upon the standards to ensure our products exceed safety and nutrition standards – including reducing the levels of heavy metals that occur naturally in soil and water.

We are disappointed that the Subcommittee report examined outdated data and does not reflect our current practices. The report also inaccurately characterized a meeting with the FDA. Like any food producer, we meet with regulatory and oversight agencies to refine and update our policies and procedures to ensure the safety of our products. As science evolves, so too should our standards and practices, which is why we met with the FDA last year to discuss how to better refine those standards and practices.

Following the meeting, we took several steps to reduce the levels of heavy metals in our finished products – including no longer using brown rice in our products that are primarily rice based, changing other ingredients and conducting additional testing of finished product before shipping. Meeting with the FDA did what the regulatory process is supposed to: collaboratively drive improvements that benefit the consumer.

Earth's Best has consistently supported efforts to reduce naturally occurring heavy metals from our food supply and stands ready to assist the Subcommittee's efforts toward that goal.

**D.    Nurture**

101.    Nurture manufacturers, distributes, and sells goods for babies under the brand name "Happy Family Organics" and two product lines: "HappyBABY" and "HappyTOT."



102.    Nurture has knowledge of consumer labels and how a "consumer friendly label" representing that the product is "Organic as Always," "NON-GMO," and "USDA ORGANIC" establishes consumer confidence and faith.  Nurture's marketing techniques also include targeting women who are part of the Special Supplemental Nutrition Program for Women, Infants, and Children (a/k/a "WIC").  The following images are some representative examples of Nurture's advertisements:

 

103.    Nurture advertises HappyBABY pouches as representing a percentage of daily vitamins needed and includes the "Non-GMO" verification on its products.  The following images are some representative examples of Nurture HappyBABY "Apricots, Sweet Potato, & Bananas" Pouch and "Pumpkin, Apples, Peaches, & Cinnamon" Pouch:

 

104.    Nurture advertises and markets HappyBABY "Clearly Crafted Oatmeal Baby Cereal" as containing "just 3 ingredients [oats, Vitamin C, and iron] including iron to help support brain development."



105.    The following image is a representative example of Nurture's "Non-GMO" verification and misleading label for "HappyBABY Superfood Puffs, Apple and Broccoli":

  

106. The front label for "HappyBABY Superfood Puffs, Apple and Broccoli" represents "25mg choline to support brain & eye health," and "NON-GMO." The back label certifies Nurture as a B Corp. A B Corp is a business that meets the highest standards of verified social and environmental performance, public transparency, and legal accountability to balance profit and purpose. Despite touting its status as a B Corp, Nurture's product labels fail to warn consumers of Toxic Heavy Metals or any other risk or condition:

107. The following image is a representative example of HappyBABY's "Organic Teethers – Sweet Potato & Banana" that represents its "Our Happy Promise" that boasts, "WE ARE REAL MOMS, PEDIATRICIANS, & NUTRITIONISTS."



108.    Nurture's response to the Congressional Report's findings is as follows:



## Our Response to the Report

The Congressional report brings to light a very important issue on the need for continued improvement in the way we work with our land and the standards that are set in the US across many foods. But as a brand that prides itself on a data-driven approach to quality, safety, and nutrition overall, we are deeply disappointed at the select usage of data we provided back in 2019, and the many inaccuracies in the report. For example, the facts are as follows:

• The data shared in the report was from 2017-2019, prior to the August 2020 finalized FDA guidance on inorganic arsenic. Our rice-based products, including Puffs, remained safe throughout this time, and we continued to improve our products by working with our manufacturers, as well as updating the product recipe, and the organic farms we source from. Today, our products have significantly lower levels than highlighted in the report, well below the 100 ppb limit finalized by the FDA in 2020.

• The report also mentioned two data points for lead—641 ppb and 580 ppb. These data points are outliers—differing significantly from other reported data points—and not replicable in our testing (the next highest data point for either product measured at 15 ppb). We chose to include these data points for full transparency and completeness on the total data set. Today, all of our products are well within the latest FDA interim guidance for lead.

• We had one result of 10 ppb mercury and 95% of products tested had less than 5 ppb. For reference, seafoods like shrimp & tuna will commonly have 30-70 ppb mercury.

We welcome additional guidance from the FDA on elements like cadmium and mercury, as these kinds of references will help us drive change widely through the industry. In the absence of defined guidelines, we look to the latest scientific research and health risk-based requirements published globally to hold our internal standards to strict quality and safety levels. Additionally, you can read more below on how as the market leader in organic baby food, we are partnering with experts and other industry leaders to create a contaminants management standard for our category, which will provide greater transparency.

E. **Sprout**

109.    Sprout markets itself as "the first and only organic baby food brand committed to honesty and transparency and launched clear food pouches for its line of organic baby food."[83] The Sprout logo touts the catchphrase "Keep it honest.  Make it real."



110.    In a press release dated October 25, 2016, Sprout declared its commitment to transparency by ensuring consumers that all information about their ingredients would be on their packaging:

> *Moms want to know what's in their baby's food, and what better way to give them that peace of mind than by actually showing it to them before they purchase it, says Rick Klauser, CEO of Sprout Foods.* Sprout has always been committed to honest transparency in all that we do starting from carefully sourced ingredients, like whole organic fruits and vegetables, to creating innovative clean recipes. We made it our mission to transition all our recipes to clear pouches. We are proud of our existing recipes and have nothing to change.
>
> Consumer demand for more transparency in the food space has been increasing in recent years. As brands are just beginning to respond to this demand, with efforts such as GMO labeling and honest ingredient lists on packaging, Sprout Foods has been ahead of this trend since the company was founded in 2009. In addition to the new clear packaging, Sprout Foods is the only baby food company to pledge the names of their varieties match the primary ingredients in the recipe.
>
> *What you see on the front of our packaging is what you'll see at the top of our ingredient list. We're the only brand dedicated to honesty in our product names across all of our lines and that's where some competitors fall short, says Klauser. We have been*

---

[83] *Sprout Foods, the Market's Cleanest Ingredient Organic Baby Food Brand, Further Elevates Commitment to Honesty and Brand Transparency with New Clear Packaging,* (Oct. 25, 2016) (online at: https://www.prnewswire.com/news-releases/sprout-foods-the-markets-cleanest-ingredient-organic-baby-food-brand-further-elevates-commitment-to-honesty-and-brand-transparency-with-new-clear-packaging-300350493.html  (last visited on March 20, 2021).

> *honest since the day we launched and are devoted to continuing to*
> *deliver products that parents can feel good about giving to their*
> *children.*[84]

111.    Sprout's website includes a "Values & Guarantee" that boasts "Our #1 goal at Sprout Foods is to provide you and your family with the highest quality products."[85]



112.    On August 16, 2018, Consumer Reports identified "Sprout Organic Quinoa Puffs Baby Cereal Snack, Apple Kale" and "Sprout Organic Baby Food Garden Vegetables Brown Rice with Turkey" as containing "worrisome levels of toxic heavy metals." Sprout responded by assuring parents: "We are a responsible company with high safety standards for our ingredients and our products…We are continuing to work with the fruit and vegetable industry to look for the

---

[84] https://www.prnewswire.com/news-releases/sprout-foods-the-markets-cleanest-ingredient-organic-baby-food-brand-further-elevates-commitment-to-honesty-and-brand-transparency-with-new-clear-packaging-300350493.html (last visited on March 20, 2021).
[85] Sprout Foods, *Values & Guarantee,* http://www.sproutorganicfoods.com/about-us/values-guarantee (last visited March 20, 2021). (emphasis added).[85]

cleanest sources of ingredients. We fully support the evolution of FDA safety regulations that helps ensure the highest levels of food safety standards for babies."[86]

113.    Sprout refused to comply with the Congressional Subcommittee's investigation. Nevertheless, the Congressional Report notes the following:

> Sprout Organic Foods did not respond to the Subcommittee at all. Despite numerous emails to executives and its general information email address, as well as numerous attempts to reach the Sprout central office by telephone, Sprout never responded or made contact with the Subcommittee.
>
> ***
>
> **Whether due to evasion or negligence, Sprout's failure to respond raises serious concerns about the presence of toxic heavy metals in its baby foods, as even limited independent testing has revealed the presence of toxic heavy metals in its products.**[87]

114.    Although Sprout has been notably silent in their refusal to cooperate with the Subcommittee, their products were deemed to contain substantial levels of Toxic Heavy Metals. Independent testing of Sprout's Baby Food Products "confirmed that their baby foods contain concerning levels of toxic heavy metals."[88]

115.    The testing conducted by Healthy Babies Bright Futures confirmed that Sprout's Baby Food Products are similarly tainted by substantial amounts of Toxic Heavy Metals.

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Sprout | Organic Quinoa Puffs Baby Cereal Snack - Apple Kale | Snack - puffs, contains rice | 107 | 47 | 39.3 | 41.5 | 1.31 | Washington, DC | amazon.com |

---

[86] Jesse Hirsch, *Heavy Metals in Baby Food: What You Need to Know, Consumer Reports* (Aug. 16, 2018) (online at: https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/) (last visited on March 19, 2021).
[87] **Exhibit A** at p. 46.
[88] *Id.*

116.    Despite proven Toxic Heavy Metals in its food, Sprout declares to its parent customers, "we say a huge YES to the good stuff and a hearty NO to the bad, because *we don't think you should ever have to worry about what you're giving your little one*."[89]

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Nationwide Class:

> **Nationwide Class**: All persons who purchased one or more of Defendants' products containing Toxic Heavy Metals, in the United States for personal/household use.[90]

118.    Plaintiff seeks certification on behalf of the following New Jersey Subclass.[91]

> **New Jersey Subclass**:  All persons residing in New Jersey who purchased one of more of Defendants' products containing Toxic Heavy Metals for personal/household use.

119.    **Excluded from the Class and Subclass are**: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) the Defendants', Defendants' subsidiaries, parents, successors, predecessors, and any entities in which the Defendants or their parents and any entities in which the Defendants have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

120.    **Numerosity (Rule 23(a)(1))**:  The exact number of members of the Class is unknown and currently unavailable to Plaintiff, but joinder of individual members herein is impractical.  The Class is likely comprised of hundreds of thousands of consumers.  Sales figures indicate that millions of individuals have purchased Defendants' Baby Food Products.  The precise

---

[89] https://www.facebook.com/sproutfoods/photos/a.398022715769/10157465902885770/?type=3 (emphasis added).
[90] Plaintiff reserves the right to re-define the Class definition prior to class certification and after having the opportunity to conduct discovery.
[91] As described above, the Nationwide Class and Subclass are collectively to as "Class" unless otherwise noted. *See* n. 2.

number of Class members, and their addresses, is unknown to Plaintiff at this time, but can be ascertained from Defendants' records and/or retailer records.  The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

121.    **Predominant Common Questions (Rule 23(a)(2)**:  The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  The common and legal questions include, without limitation:

a.    Whether each Defendant knew or should have known that their Baby Food Products contained Toxic Heavy Metals that rendered their Baby Food Products unsafe for babies;

b.    Whether Defendants wrongfully represented and continue to represent that Baby Food Products are safe for babies' consumption;

c.    Whether Defendants' representations, advertisements, warranties, labeling, packaging, and logos are false, deceptive, and misleading;

d.    Whether Defendants had knowledge that those representations were likely to deceive a reasonable consumer;

e.    Whether Defendants had knowledge that those representations were false, deceptive, or misleading;

f.    Whether Defendants continue to disseminate those false, misleading, and deceptive representations;

g.    Whether Defendants failed to warn and disclose material facts regarding their Baby Food Products and concealed internal testing results revealing dangerous levels of arsenic, lead, cadmium, mercury, and other heavy metals that are unsafe for babies;

h.    Whether Defendants' testing showed that their products contained Toxic Heavy Metals;

i.    Whether Defendants violated the laws of the State of New York;

j.    Whether Defendants violated the laws of the State of New Jersey;

k.    Whether Defendants violated the state consumer protection statutes alleged herein;

l.    Whether Defendants were unjustly enriched; and

m.    The nature of relief, including damages and equitable relief, to which Plaintiff and members of the Class are entitled.

122.    **Typicality of Claims (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class Members, purchased Defendants' Baby Food Products, suffered damages as a result of that purchase, and seeks the same relief as the proposed Class Members.

123.    **Adequacy of Representation (Rule 23(a)(4))**: Plaintiff adequately represents the Class because her interests do not conflict with the interests of the members of the Class, and she has retained counsel competent and experienced in complex class action and consumer litigation.

124.    Plaintiff and her counsel will fairly and adequately protect the interest of the members of the Class.

125.    **Superiority (Rule 23(b)(3))**: A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendants because the damages suffered by Plaintiff and the members of the Classes are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay

and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

### Declaratory Relief
### (Fed. R. Civ. P. 23(b)(1) and (2))

126.    In the alternative, this action may properly be maintained as a class action because

    a.    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for each Defendant; or

    b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

    c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

### Issue Certification (Fed. R. Civ. P. 23(c)(4))

127.    In the alternative, the common questions of fact and law, set forth in Paragraph 150, are appropriate for issue certification on behalf of the proposed Class.

### CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
### *(On behalf of Plaintiff and the Class against all Defendants)*

128.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as fitfully set forth here.

129.    Plaintiff brings this claim on behalf of herself and members of the Class.

130.    Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain.  Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description.

131.    Plaintiff and members of the Class formed a contract with one or more of the Defendants at the time they purchased Defendants' Baby Food Products.  The terms of that contract included the promises and affirmations of fact that Defendants made through their product labels, through other forms of uniform, nationwide marketing, their respective websites and on social media.  Among other affirmations of fact and promises described herein, Defendants represented that Defendants' Baby Food Products were and are safe, healthy, and appropriate for infant or child consumption.

132.    These affirmations of facts and promises, which are part of Defendants' uniform marketing, advertising, and product labeling, constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiff and members of the Class on the one hand, and the Defendants, on the other.

133.    Contrary to these affirmations of fact and promises, Defendants' Baby Food Products did not and do not contain food or beverages that are safe, healthy, and appropriate for infant or child consumption as described on the product labels or in Defendants' uniform marketing and advertising campaign.

134.    Defendants breached the express warranties and/or contract obligations by placing these Baby Food Products into the stream of commerce and selling them to consumers, when they have dangerous and/or Toxic Heavy Metals, and can cause toxicity or adverse health implications, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Defendants.  The high levels of Toxic Heavy Metals substantially impair the use, value, and safety of Defendants' Baby Food Products.

135.    At all times relevant herein, Defendants were aware, or should have been aware, of Toxic Heavy Metals in Defendants' Baby Food Products.  Defendants were on notice of these concerns with their products, but nowhere on the package labeling or on Defendants' websites or other marketing materials did Defendants warn Plaintiff and members of the Class that they were at risk of feeding their children food and/or beverages with toxic or dangerous levels of Toxic Heavy Metals.

136.    Instead, Defendants concealed the high levels of heavy metals contained in Defendants' Baby Food Products and deceptively represented that these products were safe, healthy, and appropriate for infant or child consumption.  Defendants, thus, utterly failed to ensure that the material representations it was making to consumers were true.

137.    The toxic and/or dangerous levels of heavy metals at issue in Defendants' Baby Food Products existed when they left Defendants' possession or control and were sold to Plaintiff and members of the putative classes.  The levels of heavy metals contained in the Defendants' Baby Food Products were undiscoverable by Plaintiff and members of the Class at the time of purchase of Defendants' Baby Food Products.

138.    As manufacturers, marketers, advertisers, distributors, and sellers of Defendants' Baby Food Products, Defendants were parties with exclusive knowledge and notice of the fact that these products did not conform to the affirmations of fact and promises.

139.    In addition, or in the alternative, to the formation of an express contract, Defendants made each of the above-described representations to induce Plaintiff and members of the Class to rely on such representations.

140.    Defendants' affirmations of fact and promises were material, and Plaintiff and members of the Class reasonably relied upon such representations in purchasing the Defendants' Baby Food Products.

141.    Affording Defendants an opportunity to cure their breaches of written warranties would be unnecessary and futile here.  Defendants were placed on reasonable notice of the levels of heavy metals in Defendants' Baby Food Products and breach of the warranties based on their scientific research and expertise in the food production industry.  Defendants have had ample opportunity to cure the high level of heavy metal in their Products for safe and healthy consumption by Plaintiff and members of the putative classes and their children but have failed to do so.

142.    Defendants have also had notice of their breach as set forth herein by virtue of the recent Congressional investigation into this matter and the prior 2019 report issued by Healthy Babies Bright Future.

143.    As a direct and proximate result of Defendants' breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Defendants.  Plaintiff and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment of Defendants' Baby Food Products.

## COUNT  II
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### *(On behalf of Plaintiff and the Class against all Defendants)*

144.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

145.    Plaintiff brings this claim on behalf of herself and members of the Class.

146.    Defendants are merchants engaging in the sale of goods to Plaintiff and members of the Class.

147.    There was a sale of goods from Defendants to Plaintiff and members of the Class.

148.    Defendants' Baby Food Products were sold to Plaintiff and members of the Class purchased, Defendants' Baby Food Products from authorized resellers of Defendants' Baby Food Products.

149.    By placing Defendants' Baby Food Products into the stream of commerce, Defendants impliedly warranted to Plaintiff and members of the putative classes that Defendants' Products were of merchantable quality (i.e., a product of high-enough quality to make it fit for sale, usable for the purpose it was made, of average worth in the marketplace, or not contaminated or flawed or containing a defect affecting the safety of the product), would pass without objection in the trade or business, and were free from material defects, and reasonably fit for the use for which they were intended.

150.    Defendants' products when sold, and at all times thereafter, were not merchantable or reasonably fit for either the use they were intended or the uses reasonably foreseeable by Defendants.

151.    Defendants breached the implied warranty of merchantability because Defendants' Baby Food Products suffer from the presence of Toxic Heavy Metals, such as arsenic, lead,

cadmium, and mercury, which have the propensity to cause health complications, rendering them unfit for their intended use and purpose as baby and/or children's food and beverages. The level of Toxic Heavy Metals substantially impairs the use, value, and safety of these products.

152. The toxic and/or dangerous levels of heavy metals existed when the Defendants' Baby Food Products left Defendants' possession or control and were sold to Plaintiff and members of the putative classes. The amounts of Toxic Heavy Metals contained in the Products were undiscoverable by Plaintiff and members of the putative classes at the time of their purchase of Defendants' Baby Food Products.

153. As described herein, Defendants repeatedly advertised, on the labels for Defendants' Products labels, on their respective websites, and through a national advertising campaign, among other means, that Defendants' Baby Food Products were and are safe and appropriate for infant and child consumption.

154. Contrary to these representations, Defendants' Baby Food Products possessed quantities, levels and the presence of Toxic Heavy Metals which were not revealed on Defendants' Baby Food Products and labels and in Defendants' uniform marketing and advertising campaigns. Rather, the Defendants' Baby Food Products are unsafe because they have Toxic Heavy Metals contained in their food or beverages with the propensity to cause adverse health implications. The Baby Food Products are thus unsafe and unsuitable for consumer use as marketed by Defendants. Defendants have exclusive knowledge of material facts concerning the defective nature of Defendants' Baby Food Products.

155. Plaintiff and members of the Class, at all relevant times, were intended third-party beneficiaries of Defendants and its agents in the distribution and sale of Defendants' Baby Food Products. Moreover, Defendants exercise substantial control over which outlets can carry and sell

Defendants' Baby Food Products, which are the same places that Plaintiff and members of the putative classes purchased them. In addition, Defendants' warranties are in no way designed to apply to the distributors that purchase these products in bulk and then sell them on an individual basis to each consumer. Individual consumers are the ones who ultimately review the labels prior to making their purchasing decisions. As a result, these warranties are specifically designed to benefit the individual consumers who purchase Defendants' Baby Food Products.

156.    Plaintiff and members of the Class sustained damages as a direct and proximate result of Defendants' breaches in that they paid a premium for Defendants' Baby Food Products that they would not have otherwise paid. Plaintiff and members of the Class also did not receive the value of the product they paid for; the products are worthless or worth far less than Defendants represent due to the presence of Toxic Heavy Metals contained therein which have the propensity to cause and could lead to adverse health implications.

157.    Plaintiff and members of the Class have sustained, are sustaining, and will sustain damages if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

158.    Defendants were placed on reasonable notice of the high levels of Toxic Heavy Metals contained in Defendants' Baby Food Products and breach of the warranties based on their own research into food processing and sourcing, as well as a recent Congressional investigation on the matter, and have had ample opportunity to cure the inappropriate levels of Toxic Heavy Metals for Plaintiff and members of the Class but have failed to do so. Instead, Defendants have doubled down on their efforts to convince consumers that their Baby Food Products are safe to consume and healthy for babies and children, including public statements denying that there are any issues with the Baby Food Products.

159.    As a result of the breach of the implied warranty of merchantability, Plaintiff and members of the Class are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## COUNT  III
## NEGLIGENT MISREPRESENTATION
### *(On behalf of Plaintiff and the Class against all Defendants)*

160.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

161.    Plaintiff brings this claim on behalf of herself and the Class.

162.    Defendants, directly, or through their agents and employees, made false representations, concealments, and non-disclosures to Plaintiff and members of the Class about their products' safety and testing.

163.    Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and members of the Class to purchase their Baby Food Products.

164.    In making these false, misleading, and deceptive representations and omissions, Defendants knew and intended that consumers would purchase their products, would pay a premium for their products, and would feed their products to their children.

165.    Defendants created a special relationship with Plaintiff and members of the Class through their representations regarding their products' safety and regarding the companies' rigorous, scientific testing and research.

166.    As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive statements, representations, and omissions, Defendants injured Plaintiff and members

of the Class in that they purchased, paid a premium price for, and fed their children the Baby Food Products, which were not as represented.

167.    In making the misrepresentations of fact and omissions to Plaintiff and members of the Class, Defendants have failed to fulfill their duties to disclose material facts about their Baby Food Products.

168.    The failure to disclose the true nature of the products' safety, testing, and compliance with internal safety thresholds was caused by Defendants' negligence and carelessness.

169.    Defendants, in making these misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the misrepresentations were not true. Defendants made and intended the misrepresentations to induce the reliance of Plaintiff and Class Members.

170.    Defendants allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and members of the Class.

171.    Plaintiff and members of the Class did in fact rely on these misrepresentations and purchased Defendants' Baby Food to their detriment. Given the deceptive manner in which Defendants advertised, represented, and otherwise promoted the Baby Food Products, Plaintiff's and members of the Class's reliance on Defendants' misrepresentations was justifiable.

172.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have suffered actual damages in that they have purchased products that are worth less than the price they paid and that they would not have purchased Defendants' Baby Food Products at all had they known of the presence or risk Toxic Heavy Metals or other unnatural ingredients that do not conform to the Baby Food Products labels, packaging, advertising, and statements.

173.    Plaintiff and members of the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## COUNT  IV
### VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349
*(On behalf of Plaintiff and the Class against all Defendants)*

174.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

175.    New York General Business Law Section 349(a) ("Gen. Bus. Law § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

176.    Plaintiff and the Class members are "person[s]" within the meaning of N.Y. Gen. Bus. Law §349(h).

177.    Defendants are each a "person, firm, corporation or association" within the meaning of N.Y. Gen. Bus. Law §349(b).

178.    The conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of Gen. Bus. Law § 349, and as such, Plaintiff and the Class seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting their Baby Food Products.  There is no adequate remedy at law.  Defendants misleadingly, inaccurately, and deceptively marketed their Baby Food Products to consumers as safe and concealing information about the presence of Toxic Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

179.    Defendants made affirmative misrepresentations to Plaintiff and members of the Class that Defendants' Baby Food Products were safe and suitable for consumption.  Defendants,

however, concealed, and suppressed material facts concerning the Defendants' Baby Food Products, including that Defendants' Baby Food Products were unsafe and unsuitable for babies; that they contained Toxic Heavy Metals; the level of the Toxic Heavy Metals; that internal testing showed that Defendants' Baby Food Products contained Toxic Heavy Metals; and that Defendants' policies permitted the sale of products with harmful levels of Toxic Heavy Metals.

180.    Defendants had an ongoing duty to Plaintiff and members of the Class to refrain from unfair and deceptive practices.  Specifically, Defendants owed Plaintiff and Class members a duty to disclose all the material facts regarding their Baby Food Products, including that such products contained unsafe levels of Toxic Heavy Metals because they possessed exclusive knowledge, they intentionally concealed the facts regarding Baby Food Products, including that such products contained unsafe levels of Toxic Heavy Metals and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

181.    Plaintiff and members of the Class had no way of discerning that Defendants' representations were false and misleading because members of the Class did not have access to Defendants' internal testing, internal policies, or any internal documents showing the presence of harmful heavy metals.

182.    Defendants thus violated Gen. Bus. Law § 349 by making statements, when considered from the perspective of the reasonable consumer, which conveyed that Defendants' Baby Food Products were safe and suitable for babies.  Defendants also failed to disclose and warn that the Defendants' Baby Food Products were unsafe and unsuitable for children; that they contained heavy metals; the level of the heavy metals; that internal testing showed that the products contained harmful heavy metals; and that Defendants' policies permitted the sale of products with harmful levels of heavy metals. Defendants intentionally and knowingly made affirmative

misrepresentations and failed to disclose material facts regarding the Defendants' Baby Food Products with intent to mislead Class Members.  Defendants knew or should have known that their conduct violated Gen. Bus. Law § 349.

183.    Defendants owed the Class a duty to disclose the true and unsafe nature of the Defendants' Baby Food Products.

184.    Defendants' concealment of the true characteristics of the Defendants' Baby Food Products was material to Plaintiff and members of the Class.

185.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and members of the Class, about the true nature of Defendants' Baby Food Products.

186.    Plaintiff and members of the Class would not have purchased Defendants' Baby Food Products had they known that the products were unsafe and unsuitable for babies; that they contained Toxic Heavy Metals or the levels of Toxic Heavy Metals; that Defendants' testing showed that their products contained Toxic Heavy Metals; or that Defendants' policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

187.    Defendants' violations present a continuing risk to Plaintiff and the Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

188.    Plaintiff and members of the Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.  Defendants had an ongoing duty to all customers and the public to refrain from unfair and deceptive practices.

189.    Defendants' advertising and products' packaging and labeling induced the Plaintiff and members of the Class to buy Defendants' products and to pay a premium price for them.

190.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a), and Plaintiff and the Class have been damaged thereby.

191.    As a result of Defendants' recurring, unlawful deceptive acts and practices, Plaintiff and members of the Class are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, attorneys' fees and costs, and an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the statute.

<u>**COUNT  V**</u>
**VIOLATIONS OF THE NEW YORK DECEPTIVE SALES PRACTICE ACT**
**New York Gen. Bus. Law § 350,** *et seq.*
*(On behalf of Plaintiff and the Class against all Defendants)*

192.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

193.    N.Y. Gen. Bus. Law § 350 provides, in part, that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

194.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to

which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

195.    Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements, and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading

196.    Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions regarding the safety of their products.

197.    Defendants made numerous material and affirmative misrepresentations and omissions of fact with intent to mislead and deceive concerning Defendants' Baby Food Products, particularly concerning their unsafe nature.  Specifically, Defendants intentionally concealed and suppressed material facts concerning Defendants' Baby Food Products, namely, that they were unsafe and unsuitable for babies; that they contained Toxic Heavy Metals; that Defendants' testing showed that their products contained Toxic Heavy Metals; and that Defendants' policies permitted the sale of products with Toxic Heavy Metals.  Defendants intentionally and grossly defrauded and mislead Class Members concerning the true and unsafe nature of the Defendants' Baby Food Products.

198.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

199.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

200.    Defendants made the material misrepresentations described in this Complaint in Defendants' advertising, and on the products' packaging and labeling.

201.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the products and/or feeding them to their children were and continue to be exposed to Defendants' material misrepresentations and omissions.

202.    Plaintiff and members of the Class would not have purchased Defendants' Baby Food Products had they known that the products were unsafe and unsuitable for babies; that they contained Toxic Heavy Metals or the levels of Toxic Heavy Metals; that Defendants' testing showed that its products contained Toxic Heavy Metals; or that Defendants' policies permitted the sales of products with harmful levels of Toxic Heavy Metals.

203.    Defendants' violation presents a continuing risk to Plaintiff and members of the Class.  Defendants' deceptive acts and practices affect the public interest.

204.    Plaintiff and members of the Class have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendants' violation.

205.    The Class Members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 for each Class Member, and because Defendants' conduct was committed willingly and knowingly, Class Members are entitled to recover three times actual damages, up to $10,000.  The Class also seeks an order enjoining Defendants' false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

## <u>COUNT VI</u>
### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. §§ 56:8-1, *et seq.*
### *(On behalf of the Plaintiff and the New Jersey Subclass against all Defendants)*

206.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

207.     Plaintiff brings this claim on behalf of herself and the New Jersey Subclass for violation the New Jersey Consumer Fraud Act, N.J. Stat. Ann §§ 56:8-1, et seq.

208.     Defendants are "persons," as defined by N.J. Stat. Ann § 56:8-1(d).

209.     Defendants sell "merchandise," as defined by N.J. Stat. Ann § 56:8-1(c) and (e).

210.     The New Jersey Consumer Fraud Act, N.J. Stat. Ann §§ 56:8-1, et seq., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promises, misrepresentations, as well as the knowing concealment, suppression, or omissions of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

211.     As described herein, Defendants repeatedly advertised on the labels of Defendants' Baby Food Products, on their respective websites, and through a national advertising campaign, among other items, that Defendants' Baby Food Products were and are safe, healthy, and fit for consumption by infants and children.

212.     Contrary to these representations, Defendants' Baby Food Products contain levels and quantities of arsenic, lead, cadmium, and mercury that would be material to a reasonable consumer, and do not contain the safe and healthy food and beverages described on the Defendants' product labels or in Defendants' uniform marketing and advertising campaigns. Instead, Defendants' Baby Food Products contain toxic and/or dangerous levels of heavy metals, which have been known to cause adverse health implications to babies and children, rendering Defendants' Baby Food Products, unsafe and unsuitable for consumer use as marketed by Defendants.

213.     Defendants maintained exclusive knowledge of material facts concerning the material information that Defendants' Baby Food Products contained a quantity and level of Toxic

Heavy Metals which would be material to the reasonable consumer, and which had the propensity to cause adverse health implications.

214.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

215.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and members of the Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing Defendants' Baby Food Products.

216.     Plaintiff and members of the Subclass seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT VII
## UNJUST ENRICHMENT
### *(On behalf of the Plaintiff and the Class against all Defendants)*

217.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

218.     Plaintiff brings this claim on behalf of herself and the Class.

219.     Plaintiff and the other members of the Class conferred benefits on Defendants by purchasing the Defendants' Baby Food Products.

220.     Defendants received the benefits to the detriment of Plaintiff and the other members of the Class because Plaintiff and the other members of the Class purchased a mislabeled product that is not what they bargained for and did not provide the advertised benefit.

221.     Defendants have been unjustly enriched in retaining the revenues derived from the purchases of Defendants' Baby Food Products by Plaintiff and the other members of the Class.

Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased Defendants' Baby Food Products had they known that they contained dangerous levels Toxic Heavy Metals.

222.     Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the putative classes is unjust and inequitable, Defendants must pay restitution to Plaintiff and all members of the putative classes for their unjust enrichment, as ordered by the Court.

<u>**COUNT  VIII**</u>
**FRAUDULENT CONCEALMENT**
*(On behalf of the Plaintiff and the Class against all Defendants)*

223.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

224.     Defendants concealed and failed to disclose the material fact their Baby Food Products contained, or were at risk of containing, elevated levels of Toxic Heavy Metals, that they were not testing the amount of Toxic Heavy Metals in their finished products, and that the products were not safe or healthy for consumption.

225.     Defendants had knowledge that the Baby Food Products contained, or were at risk of containing, elevated levels of Toxic Heavy Metals, that they were not testing the amount of Toxic Heavy Metals in their finished products, and that the products were not safe or healthy for consumption.

226.     Defendants had a duty to disclose that the Baby Food Products contained, or were at risk of containing, elevated levels of Toxic Heavy Metals, that they were not testing the amount of Toxic Heavy Metals in their finished Baby Food Products, and that the Baby Food Products

were not safe or healthy for consumption. Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiff and the Class would rely upon the representations and omissions of Defendant regarding the quality of its products. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains elevated levels of Toxic Heavy Metals, especially at the point of sale.

227.    Defendants' concealment was material and intentional because caregivers are concerned with what they are feeding to the children in their care. Caregivers are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy and feed to the children in their care. Defendant knows that if it had not omitted that the Baby Food Products contained, or were at risk of containing, elevated levels of Toxic Heavy Metals, that they were not testing the amount of Toxic Heavy Metals in their finished products, and that the products were not safe or healthy for consumption then Plaintiff and the Class would not have paid a premium for the Baby Food Products (or purchased them at all) and Defendants wanted to increase sales/profits.

228.    Defendants' concealment misled Plaintiff and the Class as to the true nature of what they were buying and feeding to children.

229.    Defendant fraudulently concealed that the Baby Food Products contained, or were at risk of containing, elevated levels of Toxic Heavy Metals, that they were not testing the amount of Toxic Heavy Metals in their finished products, and that the products were not safe or healthy for consumption. Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages.

230.    Plaintiff and New Jersey Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, compensatory, actual, punitive, and treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT  IX
### STRICT LIABILITY-PRODUCTS LIABILITY ACT
### *(On behalf of Plaintiff and New Jersey Subclass against all Defendants)*

231.    Plaintiff repeats, reiterates, and incorporates herein by reference the prior and subsequent allegations of this complaint with the same force and effect as if hereinafter set forth at length.

232.    Defendants are liable under a theory of strict products liability as set forth in N.J.S.A. 2A:58C-1, et seq.

233.    At all relevant times, Defendants manufactured, distributed, sold, old, and/or otherwise placed into interstate commerce Baby Food Products that contained Toxic Heavy Metals.

234.    At all relevant times, Defendants were engaged in the business of processing, manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the Baby Food Products.

235.    Defendants were knowingly an integral part of the manufacture, design, and production of Baby Food Products containing Toxic Heavy Metals.  Defendants were knowingly an integral part in introducing Baby Food Products containing Toxic Heavy Metals into the stream of interstate commerce.

236.    At all relevant times, the Baby Food Products, manufactured and supplied by the Defendants, were defective and unreasonably dangerous because, despite Defendants' knowledge that the Baby Food Products contained Toxic Heavy Metals.

237.    Defendants are liable under a theory of strict products liability as set forth in N.J.S.A. 2A:58C-1, et seq. for compensatory damages, punitive damages and costs of suit as provided by law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class, prays for relief and judgment against Defendants as follows:

a.    Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

b.    Awarding Plaintiff and the Class compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c.    Awarding Plaintiff and the Class appropriate relief, including actual and statutory damages;

d.    For punitive damages;

e.    For declaratory and equitable relief, including restitution and disgorgement;

f.    For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

g.    Awarding Plaintiff and the Class the costs of prosecuting this action, including expert witness fees;

h.    Awarding Plaintiff and the Class reasonable attorneys' fees and costs as allowable by law;

i.    Awarding pre-judgment and post-judgment interest; and

j.    Granting any other relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.


DATED:  March 29, 2021                    Respectfully submitted,

                                          */s/Michael P. Canty*
                                          **LABATON SUCHAROW LLP**
                                          Michael P. Canty
                                          Carol Villegas
                                          140 Broadway
                                          New York, New York 10005
                                          Telephone: (212) 907-0700
                                          Facsimile: (212) 818-0477
                                          mcanty@labaton.com
                                          cvillegas@labaton.com

                                          *Counsel for Plaintiff and the Proposed Class*